IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN CASTROVINCI; SUSAN M. MCGINLEY, ED.D; JAMES L. POKRIVSAK, JR.; and DAWN REAGLE,<br><br>        Plaintiffs,<br><br>    v.<br><br>EASTON AREA SCHOOL DISTRICT; FRANK PINTABONE, Individually and in His Official Capacity as the President of the Easton Area School Board; ROBERT FEHNEL, Individually and in His Official Capacity as a Member of the Easton Area School Board; KERRI LEONARD-ELLISON, Individually and in Her Capacity as a Former Member of the Easton Area School Board; JANET MATTHEWS, Individually and in Her Capacity as a Former Member of the Easton Area School Board; WILLIAM RIDER, Individually and in His Capacity as a Former Member of the Easton Area School Board,<br><br>        Defendants. | CIVIL ACTION<br>NO. 15-2980 |

**MEMORANDUM**

**SCHMEHL, J. /s/ JLS**                                                                                                                                                                         **May 24, 2016**

       Plaintiffs are several current and former administrators at the Easton Area School District. Defendants are the district and several current and former school board members. Plaintiffs allege Defendants retaliated against them for exercising their First Amendment rights by going to the police about a district IT administrator accessing their computers without authorization. In their motion to dismiss, Defendants argue Plaintiffs have failed to allege sufficient concrete retaliation, have not pled facts that would show causation, and have not alleged the involvement of each of the individual defendants with

sufficient specificity. As discussed below, the Court finds the allegations sufficient to move forward and will deny the motion, except that it will grant Defendants' request to dismiss the official-capacity aspect of the claims against the individual Defendants.

Factual and Procedural Background

Plaintiffs all work or worked for Defendant Easton Area School District. John Castrovinci was Human Resources Director and still works at the district. Susan McGinley was Superintendent of Schools; her contract was not renewed, she was reassigned to work as a fifth grade assistant principal, and she may no longer work for the district. James Pokrivsak was and still is the district's Director of Athletics. Dawn Reagle was Director of Special Education but resigned her position due to what she considers a constructive discharge.

Defendants are the district itself and several board members. Frank Pintabone was a board member and at the time of the complaint had become board president. Robert Fehnel was board president during the events that give rise to this suit, and was still on the board at the time of the complaint. Kerri Leonard-Ellison, Janet Matthews, and William Rider were all members at the relevant time but no longer serve on the board.

In the fall of 2012, Stephen Furst, another administrator who has not joined in this suit, discovered that the district's Director of Technology, Thomas Drago, had remotely accessed Furst's computer. Furst reported the matter to McGinley, who in turn reported to other administrators and the school board. McGinley recommended that the matter be taken to law enforcement, but the district undertook its own investigation. The investigation revealed that Drago had impermissibly accessed the computers of several

administrators, including all Plaintiffs, in some cases hundreds of times. Plaintiffs suggest Drago's intrusions were in fact conducted in the interest of acquiring information for some members of the school board. The board did not fire Drago or make the matter public, but Drago did resign his position.

In January 2013, Plaintiffs contacted the local police department to report Drago's actions. The complaint alleges that several members of the school board, particularly the named Defendants, were very angry that Plaintiffs had taken the matter to the police. The anger allegedly stemmed from board members' friendship with Drago and possibly the fact that the computer intrusions were done on their behalf. Plaintiffs claim they suffered retaliation for going to the police, including numerous derogatory remarks, changes in job duties, frozen salaries, and so on. The discussion below describes and considers in greater detail the particular actions allegedly taken against each Plaintiff and by each Defendant.

Drago was charged with violation of the Pennsylvania Wiretap Act (based on a recording of an executive session found on his computer) and ultimately placed in an ARD program. A grand jury investigation was undertaken to consider other possible charges against Drago for his improper accessing of administrators' computers as well as any potential criminal conduct by school board members related to covering up Drago's conduct or retaliating against the administrators. The grand jury did not recommend any criminal charges but did issue an extensive report on its findings, noting "a negative culture in the EASD involving severe mistrust between EASD administrators and members of the school board that bordered on paranoia." The report also confirmed a retaliatory sentiment related to some board members' outrage regarding Plaintiffs

contacting the police. Though the grand jury found no criminal retaliation, it specifically noted retaliation was plausible and recommended possible civil remedies.

To that end, Plaintiffs filed this suit on May 28, 2015. Plaintiffs filed a motion to dismiss. Discovery has proceeded and attempts have been made to settle the matter, but those efforts have not yet been fruitful, so the Court now issues this opinion on Defendants' motion to dismiss.

Discussion

There are four issues the Court must address. First, has each Plaintiff alleged sufficient retaliatory action? Second, does the complaint plead facts that would establish a causal connection between Plaintiffs' protected speech and any consequences they allegedly suffered? Third, do the allegations adequately note the involvement of each individual Defendant? And finally, is it appropriate to dismiss the official-capacity claims against the individual Defendants?

A. Allegations of Retaliatory Action

Plaintiffs making First Amendment retaliation claims "must show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).[1] Defendants' present motion does not challenge the first element.

---

[1] The elements of retaliation claims, and interpretation of those elements, are shared between claims based on different types of protected conduct. See *Lauren W. ex rel. Jean W.*, 480 F.3d at 267 (noting the identity

4

Typical tangible adverse actions in an employment context include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In the First Amendment context, the threshold for actions that might deter a person of ordinary firmness is "very low." *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006). When the First Amendment and employment contexts converge, "a public employee may bring a cause of action alleging that his or her First Amendment rights were violated by retaliatory harassment for the employee's speech about a matter of public concern even if he or she cannot prove that the alleged retaliation adversely affected the terms of his or her employment." *McKee v. Hart*, 436 F.3d 165, 169 (3d Cir. 2006). *McKee* notes, though, that *Suppan v. Dadonna*, 203 F.3d 228, 234 (3d Cir. 2000), which *O'Connor* also cites, involved retaliatory conduct for more than a year and the conduct included low ratings on performance reviews, which verges on tangible adverse employment consequences.

Defendants argue that the supposed retaliatory conduct cannot itself be mere speech.[2] But even the case Defendants cite is not absolute on that point: "Thus, where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow, such speech does not adversely affect a [company's] First

---

of elements between First Amendment and Rehabilitation Act claims and also citing to Title VII cases). This case in particular crosses over because it is a First Amendment case but is also in the employment context.

[2] This is at least in part because "[n]ot only is there an interest in having public officials fulfill their duties, a public official's own First Amendment speech rights are implicated." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)

Amendment rights, *even if defamatory*." *Mun. Revenue Servs., Inc. v. McBlain*, 347 F. App'x 817, 825 (3d Cir. 2009) (alteration and emphasis in original) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)). Presumably then, where the speech *does* constitute a threat, coercion, or intimidation implying imminent adverse consequences, it might very well support a retaliation claim. And neither *Municipal Revenue Services* nor *Suarez Corporation Industries* is an employment-context case.

Holding aside any retaliation in the form of speech that was simply insulting rather than threatening—even though such speech might qualify as intimidating or otherwise sufficient to meet the low First Amendment threshold—what adverse actions has each Plaintiff alleged?

> Castrovinci alleges that his duties were diminished by reassigning some of them to other employees, that his salary was frozen, making it the lowest of all director-level employees, and that he was "marginalized."
>
> McGinley alleges that she was reassigned from her position as superintendent to serve as a grade five assistant principal, which she says carried a $90,000 pay cut and constitutes a demotion and breach of her contract. Her contract was also not renewed.
>
> Pokrivsak alleges his salary was frozen at the same low level as Castrovinci's, that his duties were diminished, that his position was restructured to report to a lower-level supervisor (principal instead of superintendent), making him no longer a member of the superintendent's "cabinet," and that he was subject to a number of reprimands (these are detailed in a grand jury exhibit not attached to the complaint, but likely to be produced in discovery—depending on their nature

and context, they could be seen as either mere speech or adverse employment action).

Reagle alleges she was "threatened with the loss of her job," and was constructively discharged because she found the working conditions and the comments made by Defendants intolerable and felt she had to quit.

Thus each Plaintiff has alleged at least some concrete action that adversely affected his or her employment situation. Reagle's allegations are probably the weakest, but given the extreme vitriol of the various comments alleged, her claim of constructive discharge is sufficiently supported at this stage (and leaving her in the case along with the other Plaintiffs will not significantly increase the litigation burden on Defendants). Further, a threat that she could lose her job is the kind of speech that can constitute retaliation under the *Municipal Revenue Services* standard. Likewise, Plaintiffs' allegations that Defendant Pintabone said, regarding all of the administrators who went to the police, "f*cking fire them all," and told McGinley that "we are going to get a superintendent that does what we want them to do," while in the form of speech, can certainly be understood as threats of imminent adverse action. Altogether, Plaintiffs have met the burden of alleging retaliatory action.

### B. Causal Connection

Defendants argue that Plaintiffs have not made allegations to show "that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W.*, 480 F.3d at 267. "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the

protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Id.* Defendants deny sufficient temporal proximity because the timing is unspecified or exhibits too much delay—six months between contacting the police and McGinley's alleged demotion, for instance. But some of the less concrete retaliation in the form of speech and harassment began not long after the report to the police, and even if there was a lapse of time before the more tangible demotions, salary freezes, and so on, all the consequences Plaintiffs allege did at least occur after the report to the police (which is a step above cases this Court has seen where even the sequence of the protected conduct and retaliatory action was in question).

In any event, temporal proximity is not required. When the alleged retaliatory action is too separated in time from the protected conduct, courts look not only for a pattern of antagonism but for "evidence of intervening antagonism *or retaliatory animus*." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997) (emphasis added). Defendants state that there is no pattern of antagonism here without offering any real argument on the point, and it would be a rather unpersuasive argument. There are numerous alleged statements by multiple Defendants that demonstrate animosity toward Plaintiffs specifically concerning their report of the Drago matter to the police; even where these statements are mere speech that cannot be viewed as retaliatory action, they can still serve to demonstrate and prove that Defendants may have been motivated to retaliate by their anger at Plaintiffs' report to the police. And the fact that the statements and various tangible consequences were directed at an entire group of individuals who all participated in contacting the police does tend to establish a pattern and bolster Plaintiffs' arguments.

Moreover, temporal proximity and pattern of antagonism "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). The Third Circuit later reiterated this point, calling it "all-important." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000). That decision reversed the District Court for having

> too restrictive a view of the type of evidence that can be considered probative of the causal link. It is not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned from the record as a whole from which causation can be inferred. As we explained in Kachmar, "[i]t is important to emphasize that it is causation, not temporal proximity [or evidence of antagonism], that is an element of plaintiff's prima facie case, and temporal proximity [or antagonism] merely provides an evidentiary basis from which an inference can be drawn."

*Farrell*, 206 F.3d at 281 (alteration in original) (quoting *Kachmar*, 109 F.3d at 178). Here, looking at the whole, the Defendants' various statements and actions are more than enough to infer a causal connection between the Plaintiffs' report to the police and any adverse consequences: Defendants held an emergency executive session regarding the situation, and were immediately concerned with "who went to the police?"; they expressed outrage that the police were contacted; they were irate and screamed at some of the administrators involved; there are several sources within the complaint for the idea that certain of the Defendants were motivated by strong friendship with Drago; in

9

addition to other statements already noted, Defendant Leonard-Ellison told McGinley it was "asinine for any administrator or the superintendent to go to the police"; and on top of it all, there is a grand jury report that considered the possibility of retaliatory linkage in this matter and found it substantiated and plausible, though not in such a way as to warrant criminal charges. The Court has no difficulty concluding that these allegations could support an inference that the claimed demotions, salary freezes, duty changes, and other adverse actions were causally linked to Plaintiffs' report to the police.[3]

C. Allegations of Individual Involvement

Defendants are correct that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Defendants' argument that Plaintiffs have not made sufficient allegations in this respect is also framed much like a motion for a more definite statement. *See* Fed. R. Civ. P. 8(a) and 12(e). Defendants basically argue that Plaintiffs have stated too generally that various adverse consequences befell them or that the school district took actions against them, without specifying the particular individuals responsible, and that as a result, the complaint is not specific enough and there are insufficient allegations against the particular individual Defendants.

---

[3] Defendants' argument that there is no *Monell* claim against the school district itself does not require discussion. Defendants' briefing on that point references *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), and mentions municipal policy and custom, but their actual argument is merely that there is no violation pled, so the claim against the district must fall along with the claims against the individuals: "If this Court determines that the Plaintiffs have not demonstrated that her [sic] rights were violated—that they did not suffer First Amendment retaliation—the *Monell* claim fails as a matter of law and must be dismissed." Defendants are not challenging the first element of Plaintiffs' retaliation claim, and the Court has concluded that Plaintiffs have successfully pled the second and third elements; therefore, Plaintiffs have indeed pled a constitutional violation.

But reading the complaint and its attached grand jury report, there are definitely allegations regarding each of the individual Defendants. In the grand jury investigation, McGinley identified the five named individual Defendants as the most vocal board members in the uproar over administrators contacting the police, and the grand jury report names Leonard-Ellison, Matthews, Rider, and Fehnel as particularly involved in expressing anger and outrage. Further:

> Pintabone is the one quoted as saying, "f*cking fire them all" and telling McGinley "we are going to get a superintendent that does what we want them to do"; he also allegedly "called Castrovinci a 'f*cking piece of sh*t' and told him to 'go file your lawsuit.'"
>
> Fehnel was identified by Castrovinci as a main player in what he saw as retaliation; Fehnel testified that the Drago matter increased the desire to not renew McGinley's contract.
>
> Leonard-Ellison told McGinley it was "asinine for any administrator or the superintendent to go to the police"; she is also noted as having perhaps the strongest relationship with Drago.
>
> Leonard-Ellison and Matthews were identified by the grand jury as the two main board members "expressing a sentiment that can be characterized as retaliation and/or retribution."
>
> Leonard-Ellison, Matthews, and Rider were characterized by Fehnel's testimony as those being good friends with Drago and upset about the police report against him.

11

To be sure, most or all of these allegations that refer to specific individual Defendants are the kind of speech allegations that, as discussed above, may not constitute retaliatory action. But obviously any action taken by the school board as an entity is likely to have involved actions by its individual members. These particular allegations against the specific individuals are sufficient at this stage to tie them to a plausible role in the retaliation; the allegations demonstrate the individuals' involvement in the animosity and motivation for retaliation, and they are members of the body that allegedly engaged in tangible retaliation. It may be that a motion for summary judgment will have a different result for one or more of the individuals, but even the speech-based involvement is enough to warrant discovery to further develop each Defendant's role. Proceeding through discovery is especially reasonable in this instance, because discovery is already underway and because dropping any of the individual Defendants would not save them from participation in discovery anyway; discovery on the claim against the school district itself or against any individuals not dropped from the suit will require the cooperation of all the individual Defendants, probably even including depositions. The Court, therefore, finds the allegations of each individual Defendant's involvement sufficient to survive a motion to dismiss.

### D. Official-Capacity Claims

Defendants correctly note that official-capacity claims cover the same ground as claims against the governmental entity of which the individual is an official. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). Plaintiffs point to a case from this Court that nevertheless allowed official-capacity claims to go forward. *See Coffman v. Wilson Police Dep't*, 739

F. Supp. 257, 261-62 (E.D. Pa. 1990). The reasoning of that case, however, is not strictly on point regarding redundancy between official- and individual-capacity claims. *Coffman* addressed two different questions. The first was about whether the claim against a borough police department should be dismissed because it merged with the claim against the borough itself; the court found the claims were redundant but both valid and declined to dismiss the department, and only because the parties had not fully briefed the issue. *Id.* The second question dealt with whether the individual defendant could be liable in his individual capacity at the same time as the borough could be liable officially, and on the facts of the situation the court believed that was possible. *Id.* In neither question did the court directly address whether official-capacity claims against individuals should be dismissed where they were duplicative of claims against the government entity. Here, where the issue was fully raised in the briefing, this Court finds it better to follow the line of cases that have dismissed the redundant official-capacity claims. *See, e.g.*, *Judge v. Shikellamy Sch. Dist.*, No. 4:15-CV-0551, 2015 WL 5697220, at *11 (M.D. Pa. Sept. 28, 2015); *Moore v. City of Philadelphia*, No. CIV.A. 14-133, 2014 WL 859322, at *3 (E.D. Pa. Mar. 5, 2014) (noting that such dismissal is not mandatory but is within the court's discretion); *Aquino v. Cty. of Monroe*, No. CIV. 3:CV-05-2468, 2007 WL 1544980, at *2 (M.D. Pa. May 24, 2007); *Crane v. Cumberland Cty., Pa.*, No. CIV.A. 1:CV-99-1798, 2000 WL 34567277, at *3 (M.D. Pa. June 16, 2000), *aff'd*, 64 F. App'x 838 (3d Cir. 2003). I believe that under the law, the official-capacity claims against the individual Defendants should be dismissed.

Conclusion

       For all of the reasons explained above, the Court finds the allegations of Plaintiffs' complaint to be sufficient at this stage. The motion to dismiss will be denied by an accompanying order, except with respect to the official-capacity claims, which will be dismissed.